IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:   1:20-cv-_____

ROBERT QUINTANA,

    Plaintiff,

v.

CRYSTAL RIVER HOLDINGS, INC.;
CRYSTAL RIVER MEAT, LLC s/k/a CRYSTAL RIVER MEATS, LLC;
JBC AGRICULTURAL MANAGEMENT, LLC;
TAI JACOBER; and
RIO JACOBER,

    Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff Robert Quintana ("Plaintiff" or "Quintana"), for his Complaint and Jury Demand (the "Complaint") against Defendants Crystal River Holdings, Inc., Crystal River Meat, LLC s/k/a Crystal River Meats, LLC, JBC Agricultural Management, LLC, Tai Jacober, and Rio Jacober (collectively, "Defendants"), alleges as follows:

### JURISDICTION

1. This action is one in which this Court has original jurisdiction in that it is a civil action in which there is complete diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).

2. Quintana is an individual who is a citizen of New Mexico, domiciled in that state, and whose primary residence is located in Las Vegas, New Mexico.

3. Crystal River Holdings, Inc. ("CRH") is, and was, at all times mentioned herein, a Colorado corporation with its principal place of business in Carbondale, Colorado.

1

4. According to the official records maintained by the Colorado Secretary of State, CRH is a member-managed Colorado limited liability company with its principal place of business located in Carbondale, Colorado.

5. According to the official records maintained by the Colorado Secretary of State, JBC is a member-managed Colorado limited liability company with its principal place of business located in Carbondale, Colorado.

6. According to representations Tai Jacober previously submitted a sworn Declaration to the United States Bankruptcy Court for the District of Colorado, Case No. 18-12089-TBM (the "Bankruptcy Court") on April 6, 2018 indicating that CRH is the sole owner of affiliate entities Crystal River Meat LLC s/k/a Crystal River Meats LLC ("CRM") and JBC Agricultural Management, LLC ("JBC"). *See* **Exhibit "A"** hereto (Amended Declaration of Tai Jacober filed as ECF Doc#50 in the Bankruptcy Court).).

7. Tai Jacober is an individual who is a citizen of Colorado, domiciled in this state, and whose primary residence is located in Carbondale, Colorado.

8. Rio Jacober is an individual who is a citizen of Colorado, domiciled in this state, and whose primary residence is located in Monument, Colorado.

9. Tai Jacober and Rio Jacober (together the "Jacober Brothers") are brothers who own and/or otherwise control CRH, and, by extension, who manage CRH and JBC.

10. This action is of a civil nature involving not less than $4,376,859.49, exclusive of to-be-accrued interest and costs, as of the date of the filing of this Complaint.

11. This Court has general personal jurisdiction over all Defendants because, as set forth above, each is either (a) an entity organized under Colorado's laws or an entity composed of a single member who is itself a Colorado corporation, or (b) a natural person who is a citizen of Colorado domiciled and residing in this state.

12. This Court also has specific personal jurisdiction over Defendants because each has purposefully availed itself or himself of the laws and protections of this forum by conducting business here, including, but not limited to, entering into contracts to be performed in part in Colorado as more fully described herein.

13. Under the circumstances, the exercise of jurisdiction over Defendants is reasonable.

## VENUE

14. Venue, pursuant to 28 U.S.C. § 1391, is proper in the District of Colorado because all Defendants reside within this judicial district and the incidents complained of, or a substantial part thereof, occurred in Colorado.

## FACTUAL ALLEGATIONS

*The Parties' Contracts & Promissory Notes*

15. Since 2014, Quintana has sold cattle and provided related services to one or more of Defendants.

16. As is pertinent here, Quintana and JBC entered into a Cattle Purchase Agreement on or about October 15, 2014 (the "2014 Cattle Contract").

17. Under the 2014 Cattle Contract, Quintana agreed to sell, and JBC agreed to purchase, 853 yearling steers weighing approximately 950 pounds each for $2,000 per head. Interest was to accrue at a rate of 3.5% from the date of purchase through the date of payment in full, which was due on or before January 1, 2015. JBC was responsible for any death loss occurring after it picked up the cattle from Quintana for transport from New Mexico to Colorado. JBC was not permitted to slaughter any of the cattle before paying Quintana in full.

18. Quintana fully performed pursuant to the 2014 Cattle Contract.

19. While Check No. 3561, in the amount of $1,706,000.00, dated January 1, 2015, was tendered to Quintana he was asked to hold it until sufficient funds were available such that it would clear the account on which it was drafted. Quintana was never able to cash that check; nor was

3

the amount due and owning under the 2014 Cattle Contract paid directly to Quintana by any other means.

20. On or about October 31, 2014, Quintana and JBC entered into a Cattle Back-grounding Agreement (the "2014 Back-grounding Contract").

21. Under the 2014 Back-grounding Contract, Quintana agreed to procure calves of a specific kind and weight and run them on his New Mexico property until each reached 950 pounds or until October 31, 2015, whichever occurred first. Thereafter, JBC was to purchase the cattle from Quintana for $450 per head plus the original purchase price. Payment in full was due upon delivery of the cattle from Quintana to JBC.

22. Under the 2014 Back-grounding Contract, Quintana also agreed to procure additional calves for JBC from the Reynolds Ranch in Dalhart, Texas, and care for such cattle until January 1, 2015. JBC was to pay Quintana $100 per head for these calves on or before November 7, 2014. JBC was also to pay for any and all supplemental feed for these cattle.

23. As before, JBC was solely responsible for transporting all of the cattle subject to the 2014 Back-grounding Contract from Quintana's property in New Mexico to Colorado.

24. Under the 2014 Back-grounding Contract, Quintana and JBC agreed to split the death loss, if any, that occurred while the cattle were in Quintana's custody.

25. Quintana fully performed pursuant to the 2014 Back-grounding Contract.

26. JBC did not fully perform pursuant to the 2014 Back-grounding Contract.

27. On or about September 1, 2015, Quintana, JBC, and CRM entered into a Yearling Cattle Agreement (the "2015 Yearling Cattle Contract").

28. Under the 2015 Yearling Cattle Contract, Quintana again agreed to procure calves of certain kind and weight, for delivery to JBC on a specified schedule. Quintana was to retain title to the cattle despite physical transfer to JBC for finishing in Colorado. However, JBC agreed

to assume all liability for and management of the cattle after taking custody from Quintana in New Mexico.

29.     Under the 2015 Yearling Cattle Contract, JBC was responsible for tagging, vaccinating, and de-worming the delivered cattle. JBC was responsible for insuring the herd, and was required to add Quintana as an additional insured under the subject policy. JBC was also required to provide Quintana with a "shipping lading" identifying all cattle as each was transferred from Quintana's New Mexico property to JBC.

30.     Under the 2015 Yearling Cattle Contract, the brand with which the subject cattle had been marked was to be transferred to Quintana in the State of Colorado so as to match the ownership marking from New Mexico.

31.     Under the 2015 Yearling Cattle Contract, Quintana had the right to approve all cattle shipped to market via the Colorado state brand inspector by CRM. CRM, in turn, was to pay Quintana for each head as it was shipped to market. Specifically, CRM was to wire payment to Quintana within thirty (30) days of any shipment at a minimum rate of $2,000.00 per head until December 31, 2015, $3,000 per head between December 31, 2014 and March 31, 2015, and $3,520.00 per head after March 31, 2015.

32.     Under the 2015 Yearling Cattle Contract, JBC was required to make immediate payment to Quintana of any and all outstanding debts due if JBC was successful in its pursuit of a line of credit (up to and including the full amount due to Quintana under this or any prior contract).

33.     The 2015 Yearling Cattle Contract specifically referenced and reaffirmed outstanding debts owed by JBC to Quintana under the 2014 Cattle Contract and the 2014 Cattle Back-grounding Agreement.

34.     The 2015 Yearling Cattle Contract also amended those two prior agreements by including an increase to 8% interest on all outstanding monies owed thereunder, after December 31, 2014, until the corresponding "notes are paid in full."

5

35. Quintana fully performed pursuant to the 2015 Yearling Cattle Contract.

36. JBC did not fully perform pursuant to the 2015 Yearling Cattle Contract.

37. In 2016, Quintana and JBC entered into a new Cattle Back-grounding Agreement that was not dated (the "2016 Back-grounding Contract").

38. Under the 2016 Back-grounding Contract, Quintana agreed to procure calves of a specific kind and weight and to run them on his New Mexico property until each reached 950 pounds or until October 31, 2016, whichever occurred first. Thereafter, JBC was to purchase the cattle from Quintana for $450 per head plus the original purchase price. Payment in full was due upon delivery of these cattle from Quintana to JBC.

39. Under the 2016 Back-grounding Contract, a different payment structure was put in place for cattle that JBC "fed all winter in Colorado"—namely, JBC was to pay $350 per head plus the original purchase price to Quintana.

40. Under the 2016 Back-grounding Contract, JBC and Quintana were to split the death loss, if any, that occurred under Quintana's management.

41. Under the 2016 Back-grounding Contract, JBC was once again exclusively responsible for transporting the subject cattle from Quintana's New Mexico property to Colorado.

42. Quintana fully performed pursuant to the 2016 Back-grounding Contract.

43. JBC did not fully perform pursuant to the 2016 Back-grounding Contract.

44. On or about October 1, 2017, Quintana, JBC, and the Jacober Brothers entered into another cattle contract (the "2017 Cattle Contract").

45. Under the 2017 Cattle Contract, Quintana again agreed to procure calves of certain kind and weight, for delivery to JBC on a specified schedule. Quintana was to retain title to the cattle despite physical transfer to JBC for finishing in Colorado. However, JBC agreed to assume all liability for and management of the cattle after taking custody from Quintana in New Mexico.

46. Under the 2017 Cattle Contract, JBC was responsible for tagging, vaccinating, and de-worming the delivered cattle. JBC was responsible "for insuring the herd, and was required to add Quintana as an additional insured under the subject policy. JBC was required to provide Quintana with a "shipping lading" identifying all cattle as each was transferred from Quintana's New Mexico property to JBC.

47. Under the 2017 Cattle Contract, Quintana had the right to approve all cattle shipped to market via the Colorado state brand inspector by JBC. JBC, in turn, was to pay Quintana for each head as it was shipped to market. Due to the prior payment defaults, third party retailers to whom JBC sold processed meat—such as Whole Foods, Marcus Foods, Tonali's, Food Maven, and Mile High Delivery—were also to make payments to Quintana on JBC's behalf toward the outstanding balance due and owing by JBC to Quintana.

48. Under the 2017 Cattle Contract, JBC was also required to make immediate payment to Quintana of any and all outstanding debts due if JBC was successful in its continued pursuit of a line of credit (up to and including the full balance due to Quintana under this and/or any prior contract).

49. The 2017 Cattle Contract specifically referenced and reaffirmed outstanding debts owed by JBC to Quintana under all prior contracts, in the aggregate amount of $4,315,168.17 as of September 31, 2017. The new balance to be added to that amount was estimated as $2,409,642.53, inclusive of grazing fees but not of death loss adjustments.

50. The 2017 Cattle Contract specified that "[a]ll cattle that are not paid for on delivery are subject to an 8% annual interest rate."

51. The 2017 Cattle Contract was personally guaranteed by both of the Jacober Brothers.

52. Quintana fully performed pursuant to the 2017 Cattle Contract.

112477583.1

53. Neither JBC nor the Jacober Brothers fully performed pursuant to the 2017 Cattle Contract.

54. In 2017, the Jacober Brothers obtained personal loans (the "Personal Loans") from Quintana in the aggregate amount of $100,000.00.

55. To date, the Jacober Brothers have failed and refused to repay the remaining $50,000.00 of the Personal Loans.

56. In relation to the above-identified cattle contracts, Quintana also advanced certain care expenses (the "Care Expenses") to JBC and CRM for materials such as feed in the aggregate amount of $147,000.00.

57. To date, neither JBC nor CRM has reimbursed Quintana for the Care Expenses.

58. In 2017, JBC and CRH provided a copy of a promissory note in the amount of $8,023,117 (the "2017 Note") to Quintana along with a related fully-executed security agreement (the "2017 Security Agreement").

59. The 2017 Note was intended to evidence refinancing of the aggregate outstanding debt owed by CRH, CRM, JBC and the Jacober Brothers to Quintana on all prior contracts by and between any combination of these parties in relation to the various cattle transactions detailed above.

60. Upon information and belief, JBC and CRH executed the 2017 Promissory Note, but retained the original rather than delivering it to Quintana.

61. Under the 2017 Note, principal and interest payments were due to Quintana as follows:

    a. Equal monthly payments of $150,000 commencing on February 18, 2017 through June 18, 2022;

    b. Followed by a final payment on July 18, 2022, equal to the remaining unpaid principal and interest;

  c. The schedule of payments was to continue as set forth above, regardless of any unscheduled partial prepayments, if any, and cease upon payment in full;

  d. All payments were to be allocated first to unpaid principal, before being applied to accrued interest; and

  e. Any and all accrued interest is to be compounded and capitalized into principal on each annual anniversary of the 2017 Note.

62. The 2017 Note includes a standard acceleration clause under which an event of default may entitle Quintana to call the entire outstanding principal and accrued interest balance due immediately.

63. Both the 2017 Note and the related 2017 Security Agreement include a fee-shifting provision entitling Quintana to reimbursement of costs of collection and attorneys' fees incurred in relation to enforcement of collection rights under the debt instrument.

64. To date, the borrowers under the 2017 Note and the aforementioned contracts have made no direct payments to Quintana.

65. In 2018, JBC and the Jacober Brothers executed a promissory note (the "2018 Note") in favor of Quintana in the principal amount of $135,509.20. The 2018 Note memorialized amounts due in relation to delivery from Quintana to JBC and the Jacober Brothers upon Quintana's procurement of 97 steers from the Cold Mountain Ranch and Williams Fales. Periodic payments in the amount of $1,397 were to be made to Quintana within three weeks of any referenced cattle shipment, with the full balance due and owning no later than February 18, 2018.

66. To date, neither JBC nor the Jacober Brothers have paid any amount due under the 2018 Note.

### *Quintana's Demand for Cure of Defendants' Monetary Defaults*

67. Given Defendants' monetary defaults detailed above, Quintana reconciled related books and records such that all incoming payments collected from third-party buyers of the subject meat were allocated to the oldest invoices due and owing.

68. On April 10, 2020, by and through counsel, Quintana issued a formal demand for payment on Defendants (the "Demand"). Specifically, Quintana sought payment in full of $4,262,704.57—the aggregate outstanding balance of principal and accrued interest as of the date of the Demand.

69. In response, through counsel, Defendants stated that "after falling behind in payments due to market conditions, JBC was progressing well toward paying down the shortfall to Mr. Quintana" until a third party took certain action that "pulled the rug out from under JBC's business" and effectively ended its operations, as well as those of CRH and CRM.

70. According to Defendants' counsel none of the Defendants "have any assets to speak of" and the Jacober Brothers were considering filing bankruptcy protection.

71. Upon information and belief, none of Defendants have since submitted a bankruptcy petition.

72. Since Quintana's issuance of the Demand, Defendants have persisted in their failure and refusal to make payments on the outstanding balance due and owing to Quintana.

73. The last periodic payment of $3,778.75 from a third party made to Quintana on Defendants' behalf was received on or about July 30, 2020.

74. As of July 31, 2020, the total outstanding balance due and owing to Quintana by Defendants is $ 4,376,859.49, with interest continuing to accrue.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract—All Defendants)

75. Quintana repeats and re-alleges all of the foregoing allegations and incorporates the same by this reference.

76. Quintana and Defendants are all parties to one or more of the contracts predating the 2017 Cattle Contract, which is a valid and enforceable contract.

77. In forming the 2017 Cattle Contract, the parties intended to reaffirm the outstanding debts owed by all Defendants to Quintana pursuant to the prior contracts identified above.

78. Specifically, the 2017 Cattle Contract recognizes that as of September 31, 2017 one or more of Defendants owed Quintana at least $4,315,168.17.

79. The 2017 Cattle Contract did not purport to excuse any portion of the outstanding debt owed by any Defendant. Rather, it reaffirmed all such debt and included new personal guarantees by both of the Jacober Brothers.

80. Quintana performed all of its obligations under the 2017 Cattle Contracts and all preceding related contracts reaffirmed therein.

81. Defendants breached their obligations under the 2017 Cattle Contract, and the reaffirmed prior contracts, by failing and refusing to timely pay Quintana the outstanding balance due and owing to him under that modified agreement.

82. As a direct and proximate cause of Defendants' breaches of the 2017 Cattle Contract, Quintana has suffered monetary damages in an amount to be proven at trial.

83. Quintana has also sustained additional compensable damages in the form of attorneys' fees and costs to file a lawsuit to compel Defendants' performance under the 2017 Cattle Contract as provided for in the interrelated 2017 Note and Security Agreement.

## SECOND CLAIM FOR RELIEF
**(Breach of the Implied Covenant of Good Faith and Fair Dealing—All Defendants)**

84. Quintana repeats and re-alleges all of the foregoing allegations and incorporates the same by this reference.

85. Every above-referenced contract, including the 2017 Cattle Contract at issue here, contains an implied covenant of good faith and fair dealing.

86. Defendants owed, and continue to owe, a duty of good faith and fair dealing under the subject contracts to Quintana.

87. The reaffirmation of debt and addition of two personal guarantees operated as material terms aimed at inducing Quintana to forestall collection action and to instead continue to supply cattle and related services to Defendants.

88. Defendants breached their respective duties of good faith and fair dealing under the 2017 Cattle Contract and prior related contracts through acts and omissions that were unfaithful to the purposes and spirit of these interrelated agreements.

89. Specifically, Defendants breached their respective duties of good faith and fair dealing under the 2017 Cattle Contract by:

    a. concealing their true financial condition, and apparent inability to pay the outstanding debt due to Quintana, much less the additional debt contemplated by the new agreement;

    b. misrepresenting their pursuit of, and realistic ability to obtain, a line of credit sufficient to pay all, or a substantial portion of, the monies owed to

Quintana within a reasonable time of entering into the 2017 Cattle Contract; and

c.  generally engaging in the conduct described in this Complaint.

90.  As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, Quintana has suffered damages in an amount to be proven at trial.

91.  As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, Quintana has incurred and continues to incur attorneys' fees and costs in the enforcement of its rights and remedies. Defendants are liable to Quintana for such expenses in an amount to be proven at trial.

**THIRD CLAIM FOR RELIEF**
**(Breach of Promissory Notes—All Defendants)**

92.  Quintana repeats and re-alleges all of the foregoing allegations and incorporates the same by this reference.

93.  Quintana, CRH, and JBC entered into a binding payment agreement to bring Defendants current under the 2017 Contract (and all prior contracts incorporated therein by reference), as evidenced by the 2017 Note.

94.  Quintana is the holder of the 2017 Note.

95.  The 2017 Note is valid and enforceable against borrowers CRH and JBC.

96.  Quintana, JBC, and the Jacober Brothers entered into a binding payment agreement regarding a final acquisition of 97 steer in 2018, as evidenced by the 2018 Note.

97.  Quintana is the holder of the 2018 Note.

98.  The 2018 Note is valid and enforceable against borrowers JBC and the Jacober Brothers.

99. By failing and refusing to pay amounts due and owing to Quintana under either the 2017 Note and 2018 Note, Defendants have breach both instruments.

100. Defendants' breaches of the 2017 Note and 2018 Note, respectively, have damaged Quintana in an amount to be proven at trial.

101. Quintana has also incurred and continues to incur attorneys' fees and costs in the enforcement of its rights and remedies. Defendants are liable to Quintana for such expenses in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### (Fraudulent Inducement—All Defendants)

102. Quintana repeats and re-alleges all of the foregoing allegations and incorporates the same by this reference.

103. As set forth above, Defendants made certain representations to Quintana in order to secure additional calves from him over a period of four years.

104. Specifically, Defendants led Quintana to believe that their ranching operations were profitable, that despite cash-flow problems they were solvent, that Defendants were credit-worthy and actively pursuing institutional financing so as to bring their balance due and owing to Quintana current (and, in turn, that continuous and uninterrupted ranching operations and meat sales were necessary to obtain such a "bridge" loan or line of credit), that revenue due and owing to them by meat purchasers would be sufficient to pay amounts payable under the various contracts to Quintana, and that Quintana would be paid before the Jacober Brothers would receive disbursements of such funds from CRH, CRM, or JBC.

105. Absent such misrepresentations of material fact, Quintana would not have continued to do business with CRM, JBC, or the Jacober Brothers.

106. Quintana reasonably relied on Defendants' misrepresentations.

107. Quintana's reliance upon the misrepresentation(s) was justifiable under the circumstances.

108. This justifiable reliance resulted in damage to Quintana in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF
(Unjust Enrichment—All Defendants)

109. Quintana repeats and re-alleges all of the foregoing allegations and incorporates the same by this reference.

110. Quintana provided valuable goods and services to Defendants pursuant to the 2018 Note and 2017 Cattle Contract, as well as certain prior related agreements incorporated therein by reference.

111. By failing and refusing to pay the outstanding debt owed to Quintana under the various cattle contracts and related promissory notes, Defendants have received benefits for which they have failed to pay.

112. The benefits received by Defendants were retained at the expense of Quintana, who had a reasonable expectation of payment under the 2018 Note, the 2017 Cattle Contract and all prior related agreements incorporated therein by reference.

113. Under the circumstances described above, it would be unjust for Defendants to retain benefits of the 2017 Cattle Contract without compensating Quintana the full amount that he reasonably expected to be paid in the subject cattle transactions.

114. Quintana is entitled to payment of an amount to be determined at trial.

WHEREFORE, Quintana demands judgment against Defendants, jointly and severally, as follows:

1. For compensatory damages in an amount to be proven at trial;

2. For interest at the rate provided for by the 2017 Cattle Contract and/or allowed by applicable law;

3.      For statutory damages, as provided for by applicable law;

4.      For costs of suit incurred in this action, including but not limited to reasonable attorneys' fees; and

5.      For such other and further relief as this Court may deem just and proper.

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted: October 6, 2020.

           LEWIS ROCA ROTHGERBER CHRISTIE LLP

*s/Angela M. Vichick*
Chad S. Caby
Angela M. Vichick
1200 Seventeenth Street, Suite 3000
Denver, CO 80202-5835
Tel.:     303.623.9000
Fax:     303.623.9222
Email:   ccaby@lrrc.com
         avichick@lrrc.com

*Attorneys for Plaintiff*

16

112477583.1